Eddie Ray **KELLY** and Jerry Carroll, Plaintiffs,

v.

**A.L. WILLIAMS CORPORATION** and A.L. Williams & Associates, Inc., Defendants.

Civ. A. No. CV 85–L–5070–NE.

United States District Court, N.D. Alabama, Northeastern Division.

Nov. 13, 1986.

Robert H. Ford, Brinkley & Ford, Fred B. Simpson, Simpson, Hamilton & Ryan, Huntsville, Ala., for plaintiffs.

Crawford S. McGivaren, Jr., Larry B. Childs, Cabaniss, Johnston, Gardner Dumas & O'Neal, Birmingham, Ala., James Pruett, Pruett, Hudson, Turnback & Warren, Gadsden, Ala., for defendants.

## MEMORANDUM OPINION

LYNNE, Senior District Judge.

This case came before the Court at the pre-trial conference on motions for summary judgment filed by the defendants, A.L. Williams and Associates, Inc. and A.L. Williams Corporation. The Court previously dismissed all the claims in this case other than plaintiffs' allegations of fraud.[1]

Defendant A.L. Williams and Associates, Inc. ("A.L. Williams") acts as a general agent for the sale of life insurance. Plaintiffs, Eddy Ray Kelly and Jerry Carroll, were representatives of A.L. Williams from late 1978 until December 22, 1983, at which time A.L. Williams terminated their contracts.[2]

Plaintiffs' complaint alleged that Kelly and Carroll were fraudulently induced to come to work for A.L. Williams in 1978. The complaint claimed that an agent of A.L. Williams named S. Hubert Humphrey falsely represented the compensation plaintiffs would receive as representatives of A.L. Williams. The essence of plaintiffs' claim was stated as follows:

Early in the year 1978, S. Hubert Humphrey, as an agent servant to or representative of A.L. Williams, came to the Plaintiffs and represented to both of them that A.L. Williams was a company which operated through a pyramid scheme of marketing. Mr. Humphrey represented to the Plaintiffs that the A.L. Williams Company sold term life insurance and promoted a plan by which policy holders would convert their "whole life" policies with other companies to term life policies and invest the difference between the amount of a premium for a whole life policy and the amount of a premium for the term life

---

1. On August 1, 1986 the Court entered partial summary judgment in favor of the defendants dismissing plaintiffs' claims of breach of contract and conspiracy to defraud. The Court's prior order also granted motions for summary judgment filed by four other defendants, Massachusetts Indemnity and Life Insurance Company, American Can Company, Pennsylvania Life Insurance Company and Penncorp Financial, Inc.

Defendant, A.L. Williams Corporation, is a holding company. The record shows that plaintiffs have had no dealings with A.L. Williams Corporation. In addition to the statute of limitations bar addressed in this opinion, summary judgment should be granted in favor of A.L. Williams Corporation because plaintiffs are unable to show that A.L. Williams Corporation made any representations to either of them; and, notwithstanding the similarity of names, plaintiffs have not shown any basis on which A.L. Williams Corporation should be responsible for any actions of A.L. Williams & Associates, Inc. Plaintiffs have submitted nothing in opposition to the dismissal of A.L. Williams Corporation.

2. Plaintiffs have not made any claim in this suit that the termination of their contracts was wrongful. The contracts of both plaintiffs provided for the express right of either party to terminate the agreement at any time. In granting partial summary judgment this Court previously concluded that plaintiffs have received all compensation due them under their contracts with A.L. Williams and Massachusetts Indemnity and Life Insurance Company, a life insurance company with which plaintiffs had contracts.

policy in money market accounts or other similar investments. Mr. Humphrey told the Plaintiffs that this marketing scheme was "dynamite" and that they would expect to become extremely wealthy if they would go to work with A.L. Williams and work hard at this pyramid sales scheme. He represented to them that they would receive commissions or overrides on every person who sold life insurance through A.L. Williams that were recruited by the Plaintiffs. In turn, every person who was recruited by the Plaintiffs could recruit more sales persons who in turn would sell more life insurance policies to which the Plaintiffs would be entitled to commissions through A.L. Williams. Mr. Humphrey told the Plaintiffs that they would become entitled to these commissions or overrides for the rest of their life and that in a few short years they would become independently wealthy.

Complaint, ¶ 10. It is apparent, and plaintiffs have so stated in their deposition testimony, that the cornerstone of the alleged scheme was the plaintiffs' lifetime right to override commissions on sales by every person whom plaintiffs recruited for A.L. Williams. Although Kelly was able to more than triple his annual income,[3] neither plaintiff achieved the wealth they claimed to have been promised.

The defendants contend that plaintiffs' fraud claims are barred by the one year Alabama statute of limitations.[4] This Court agrees. The nature of the key representation as alleged in the complaint was such that plaintiffs could, and did, discover that it was not true, or that A.L. Williams did not intend to honor it, within a short period of time after plaintiffs began work. The record in this case establishes that plaintiffs were on notice of the alleged fraud more than three years before suit was filed on December 20, 1984.

According to their sworn testimony, plaintiffs received actual notice of the falsity of the claimed representation when, as they recruited salesmen, A.L. Williams failed to assign the recruits to plaintiffs' "hierarchies,"[5] or, after assigning recruits to them, reassigned them, resulting in the payment of overrides to someone other than Kelly and Carroll. Kelly and Carroll also received notice of the falsity of the alleged representations when they signed contracts with A.L. Williams in 1981 and 1982 that were inconsistent with the promises upon which plaintiffs base their claims in this case.

Because the record eliminates any doubt that plaintiffs were on notice of their cause of action more than one year before this suit was filed, no genuine issue of fact exists, and defendants are entitled to entry of a summary judgment.

## FACTS

In ruling on defendants' motions for summary judgment, the Court's first task is to determine whether any genuine issue exists as to a material fact. In this case the plaintiffs' deposition testimony provides the principal basis for defendants'

---

**3.** Kelly stated in answers to interrogatories that in 1978 he earned approximately $18,000 working in a factory and coaching high school football. He testified that by 1980 he was earning $50,000 to $70,000 from his work with A.L. Williams.

**4.** The parties agree that the one-year statute of limitations of § 6–2–39, ALA. CODE–1975 (repealed 1985) governs this case. On January 9, 1985, the Alabama Legislature replaced the one-year statute with a two-year limitations period, 1984 ALA. ACTS, 2nd Ex. Session, No. 85–39, p. 40. The general rule, however, is that where a cause of action is barred at the time of enactment, the adoption of a longer statute of limitations does not revive the action. The Court of Appeals expressly has held that the new limita-

tions period of § 6–2–38, ALA. CODE–1975 (1985 supp.) does not apply to fraud claims that arose before enactment of the 1985 amendment. *Lampliter Dinner Theater, Inc. v. Liberty Mutual Ins. Co.,* 792 F.2d 1036 (11th Cir.1986). Since this suit was filed in 1984 there could be no dispute about the applicable limitations period.

**5.** Overrides are a portion of the commission earned from the sale of insurance by another person. Kelly and Carroll explained that A.L. Williams was organized into "Hierarchies," so that each manager would receive overrides on sales by persons under him in his hierarchy. Plaintiffs testified that they understood that they could only receive overrides from individuals assigned to their hierarchies.

motions, and the Court accepts plaintiffs' testimony as true, for purposes of these motions.[6] Accordingly, there are no real disputes between the parties as to the facts. The dispute is over the conclusions that should be drawn from the facts.

The primary question before the Court is whether Kelly and Carroll were on notice prior to December 20, 1983, that they did not have a lifetime right to receive overrides on all sales made by each salesman they recruited. The record shows that plaintiffs received notice by two primary means: (1) by their actual knowledge that they were not receiving overrides upon salesmen recruited by them; and (2) by their execution and receipt of contracts that were inconsistent with the alleged representation.

### Assignment of Recruits to Plaintiffs

The nature of the alleged promise called for immediate performance. If plaintiffs were entitled to lifetime overrides on each recruit, payment should have commenced when Kelly's and Carroll's recruits first began to sell policies. Kelly testified that plaintiffs were paid and received commission statements twice per week. Thus, Kelly and Carroll were informed twice a week whether or not sales by their recruits resulted in overrides to them.

In their depositions both Kelly and Carroll acknowledged numerous instances in which they received knowledge that they were not receiving overrides on all their recruits. Indeed, plaintiffs testified that on several occasions *all* their recruits were taken away from them, so that at various times they were receiving overrides from *none* of the people they had recruited.

Carroll testified that A.L. Williams' failure to keep its commitment began with the first salesmen that he recruited in 1978. Carroll further testified that all his recruits were taken away from him on three separate occasions in 1979, 1980 and 1983. He admitted that he realized in 1979 that the representation was untrue, and that he confronted Hubert Humphrey and argued with

him about the misrepresentation. Carroll testified as follows:

Q. You said he [Humphrey] misrepresented to you the fact that agents that were hired by you would stay in your hierarchy. My question was: When did you find out that was a misrepresentation?

A. Well, I knew that I had since—when I hired the first few people, I knew they wasn't under me at that time. But like I said, I was naïve. It was later on that I confronted him about it.

Q. When did you confront him about it? What year?

A. It was '79.

Q. When you say "confronted," did you physically talk to him about taking agents from you?

A. Right.

Q. At that confrontation, did you tell him that he had told you that you would keep the agents in your hierarchy and that he had been taking agents from you and you didn't like that, or something to that effect?

A. We openly talked about it a lot and openly argued about it a lot, and not only Eddy but other people—at various times he took people and sales and the things that we talked about. We openly discussed it from that time on.

1st Carroll deposition at 136–7.

Eddy Ray Kelly testified that every one of the recruits in his hierarchy was assigned away from him in 1980 and 1981, so that thereafter he never received any overrides on them. Kelly stated that he found out in 1981 that the representation concerning overrides was not true. 1st Kelly deposition at 21–23.

By 1983, Carroll had gone back to his former job with Southern Railway Company. In March, 1983, Carroll and Kelly attempted to transfer all Carroll's agents to

---

**6.** The defendants have vigorously denied the plaintiffs' averments of fraud. For purposes of these motions, the Court and defendants as-

sume, *arguendo,* that plaintiffs' testimony is true.

Kelly, so that Kelly would receive the overrides from Carroll's hierarchy. A.L. Williams refused to permit the transfer. On March 22, 1983, Hubert Humphrey, as National Sales Director of A.L. Williams, wrote Carroll informing him that his hierarchy was being assigned to others, and that Carroll would not be permitted to recruit any more salesmen. Kelly received a similar, though somewhat milder, letter, placing certain restrictions on Kelly's activities. Carroll received no more overrides on any sales made after March, 1983.

*Plaintiffs' Contracts*

Plaintiffs attained the title of "Regional Vice Presidents" in 1981. In July and October, respectively, Kelly and Carroll executed identical contracts with A.L. Williams, entitled "Regional Vice President Agreement." The contracts recited various rights and responsibilities of each party. Paragraph 15H provided:

> H. This Agreement, including any schedules and exhibits attached hereto and the provisions thereof, constitutes the entire agreement of the parties. No modification hereof shall be binding upon Williams unless in writing and signed or initialed by Williams. This Agreement supercedes all prior agreements between Williams and RVP.

Paragraph 9 of the Agreement provided that plaintiffs would be "vested as to renewal commissions" three years after becoming Regional Vice Presidents.

On December 17, 1982, plaintiffs executed new Regional Vice President Agreements. The new Agreements were much like the 1981 contracts. The requirements for vesting were changed, however, to provide for immediate vesting of renewal commissions for all existing Regional Vice Presidents. Plaintiffs have received and continue to receive renewal commissions from Massachusetts Indemnity and Life Insurance Company for policies sold prior to

their termination. Kelly testified that he received $11,000 for 1985 in renewal commissions.

Neither the 1981 nor the 1982 contracts included the promises on which plaintiffs based this lawsuit. Both contracts make it clear that Regional Vice Presidents are not entitled to any further compensation after termination, except vested renewal commissions. Plaintiffs' counsel has conceded and it is obvious that the contracts were inconsistent with the representations that plaintiffs allege were made to them.[7]

## DISCUSSION

As the Supreme Court observed long ago, "Statutes of limitation are vital to the welfare of society and are favored in the law." *Wood v. Carpenter,* 101 U.S. (11 Otto) 135, 139, 25 L.Ed. 807 (1879). The Alabama Court has taken the position that "[s]tatutes of limitations are founded in part at least on general experience that claims which are valid usually are not allowed to remain neglected, and that the lapse of years without any attempt to enforce a demand creates a presumption against its original validity or that it has ceased to exist." *Seybold v. Magnolia Land Co.,* 376 So.2d 1083, 1086 (Ala.1979).

 Under Alabama law the statute of limitations for fraud commences once the fraud is readily discoverable or the potential plaintiff is on notice that a fraud may have been perpetrated. The standard for accrual of a fraud claim is objective, and the cause of action is deemed to accrue when facts are known or available to the plaintiff which would lead to the discovery of the fraud in the exercise of reasonable diligence. Section 6-2-3, ALA.CODE-1975,[8] provides, as follows, for the tolling of the statute of limitations:

---

**7.** In a Motion to Allow First Amendment to Complaint plaintiffs expressly admitted that "the contract in various terminology took away those three basic principles upon which plaintiffs had come to rely from the various misrepresentations of the defendants, A.L. Williams and their agents."

**8.** Since this suit was filed, the Alabama Legislature has amended § 6–2–3 to allow a discovery period of two years. The one-year period applies to this suit. *Lampliter Dinner Theater, Inc. v. Liberty Mutual Ins. Co.,* 792 F.2d 1036 (11th Cir.1986).

In actions seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have one year within which to prosecute his claim.

In *Lampliter Dinner Theater, Inc. v. Liberty Mutual Ins. Co.*, 792 F.2d 1036, 1043 (11th Cir.1986), the Court of Appeals discussed § 6-2-3:

Ala.Code § 6-2-3 does not require actual notice of fraud, the limitations period commences once the fraud is readily discoverable or the potential plaintiff is on notice that a fraud may have been perpetrated. *Johnson v. Shenandoah Life Insurance Co.*, 291 Ala. 389, 281 So.2d 636, 642-43 (1973). Facts that would provoke a reasonable person's inquiry and lead to a discovery of the fraud commence the limitations period. *Butler v. Guaranty Savings & Loan Ass'n.*, 251 Ala. 449, 37 So.2d 638 (1948).

*See Phillips v. Amoco Oil Co.*, 799 F.2d 1464 (11th Cir.1986) ("According to Alabama law, a fraud cause of action accrues, and the one-year statute of limitations begins to run, at the discovery of the facts constituting the fraud. Such discovery occurs when the plaintiff should have discovered facts that would provoke a person of ordinary prudence to inquiry"); *Hunt v. American Bank & Trust Co.*, 783 F.2d 1011, 1014 (11th Cir.1986) ("... what matters is not when the information was actually known, but rather when in the exercise of due diligence it should have been known"); *Pines v. Warnaco, Inc.*, 706 F.2d 1173, 1178 (11th Cir.1983) ("Under Alabama law fraud is deemed discovered when it ought to be discovered.")

The Alabama Supreme Court has held that a party seeking to take advantage of § 6-2-3 has the affirmative burden of proving his lack of notice. In *Johnson v. Shenandoah Life Ins. Co.*, 291 Ala. 389, 396, 281 So.2d 636, 642 (1973), the court wrote:

A party, availing himself of this statute, would be required to aver with precision, the facts and circumstances constituting the fraud—and how and when these facts were discovered, what prevented a discovery before the bar of the statute was complete—and to acquit himself of all knowledge of facts which ought to have put him on inquiry.

In *Lampliter Dinner Theater, supra*, the Court of Appeals followed the Alabama authority, holding that "[t]he limitations period commenced once [plaintiff] Lampliter was on notice that it may have been defrauded," and "[t]he burden was squarely on Lampliter to prove that it was unaware of facts that would lead a reasonable person to suspect fraud." 792 F.2d at 1043. *Accord, Walker v. American Motorists Ins. Co.*, 529 F.2d 1163 (5th Cir. 1976).

▪ As discussed above, the objective standard under § 6-2-3 is well established. Kelly's and Carroll's cause of action for fraud accrued when they learned or should have learned facts that would provoke a person of ordinary prudence to inquire about the truthfulness of the representation.

In this case each of several events independently was sufficient as a matter of law to put Kelly and Carroll on notice of their claims before December 20, 1983. First, plaintiffs testified that in 1979 (Carroll), 1980 (Carroll and Kelly), 1981 (Kelly) and 1983 (Carroll), A.L. Williams violated the alleged promise by transferring recruits out of their hierarchies, so that overrides were not thereafter being paid to plaintiffs on the recruits. Therefore, at all times after 1980, both plaintiffs were reminded when they received their commission statements twice a week that they were not receiving overrides on all their recruits. Plaintiffs do not dispute that they knew that A.L. Williams was not keeping the claimed commitment, as of the dates indicated and thereafter.[9] To the contrary,

---

9. At oral argument plaintiffs' attorneys asserted that the breaches of the commitment prior to 1981 (when plaintiffs became Regional Vice Presidents) were the fault of S. Hubert Hum-

phrey, who, like plaintiffs, was an independent contractor, for whose actions A.L. Williams was not responsible. In this attempt to avoid summary judgment, plaintiffs come dangerously

they have admitted that they knew as of such dates that they were not receiving overrides on the salesmen that they had recruited.

In *Phillips v. Amoco Oil Co.*, 799 F.2d 1464 (11th Cir.1986), the plaintiffs alleged that Amoco had misrepresented that plaintiffs would have lifetime employment. Affirming the district court's entry of summary judgment, the Court of Appeals held that "[t]he statute of limitations begins to run when the plaintiff knows or should know that the employer does not intend to perform as promised." 799 F.2d at 1469. In the instant case, by their own admissions, Carroll and Kelly knew by 1979 (Carroll) and 1981 (Kelly) that A.L. Williams was not going to make good on its alleged promise of overrides on every sale by every salesman that plaintiffs recruited. Regardless of the admissions, the record shows that Carroll had notice in 1979 that the promise had been violated, and Kelly had notice in 1980. Plaintiffs have failed to carry the burden of showing that they were "unaware of facts that would lead a reasonable person to suspect fraud," *see* *Lampliter Dinner Theater, Inc. v. Liberty Mutual Ins. Co.*, 792 F.2d, 1036, 1043 (11th Cir.1986). To the contrary, the record shows that by 1980 or 1981, at the latest, plaintiffs should have been and were aware of facts that would arouse suspicion that the alleged promises would not be fulfilled. Therefore, under Alabama law the one year statute of limitations began to run, and it expired before this suit was filed on December 20, 1984.[10]

If the statute of limitations had not already commenced, plaintiffs' execution and receipt of "Regional Vice President Agreements" in 1981 and 1982 as a matter of law would have started the running of the statute. The contracts expressly contained all the terms of Kelly's and Carroll's agreements with A.L. Williams. There is no dispute that the written contracts were inconsistent with the alleged prior representations to them which form the basis of their claim of fraud.

The law of Alabama is settled that the receipt of a contract inconsistent with the facts allegedly represented starts the run-

---

close to conceding their case on the merits, because plainly Humphrey's alleged misrepresentations are the heart of plaintiffs' case, as set out in the complaint and verified in answers to interrogatories and deposition testimony. If, however, as alleged in the complaint, A.L. Williams, through Humphrey, made false promises to plaintiffs, their discovery of the falsity would start the statute of limitations running even if the discovery came as a result of the acts of an independent contractor. In suggesting that the Court overlook the events prior to 1981 that disproved the alleged promises, plaintiffs have ignored the occurrences in March, 1983, which unquestionably also put plaintiffs on notice more than one year before this suit was filed. At that time, A.L. Williams rejected plaintiffs' attempt to transfer Carroll's agents to Kelly. The agents were instead assigned to others, and Carroll received no overrides on sales made after the reassignment. Kelly has admitted that he was informed of A.L. Williams' actions shortly after they occurred.

**10.** In their affidavits filed on the eve of the pretrial conference, Carroll averred that he did not discover that the representations were false, and Kelly averred that he did not discover the fraud as alleged in the complaint, until after December 20, 1983. To the extent the affidavits purport directly to contradict plaintiffs' prior sworn testimony, this Court properly could treat them as a sham, which under the law of this circuit would not suffice to create a genuine issue of material fact. *Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656 (11th Cir.1984). Perhaps more importantly, under Rule 56, facts, rather than conclusions, are required in affidavits opposing summary judgment. In *Evers v. General Motors Corp.*, 770 F.2d 984 (11th Cir.1985), the Court of Appeals wrote that "an affidavit must set forth specific facts in order to have any probative value." The court explained:

When a properly supported summary judgment motion has been made Fed.R.Civ.P. 56(e) provides that "an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not respond, summary judgment, if appropriate, shall be entered against him."

This court has consistently held that conclusory allegations without specific supporting facts have no probative value. *Gordon v. Terry*, 684 F.2d 736, 744 (11th Cir.1982), *cert. denied*, 459 U.S. 1203, 103 S.Ct. 1188, 75 L.Ed.2d 434 (1983); *Broadway v. City of Montgomery*, 530 F.2d 657, 660 (5th Cir.1976). 770 F.2d at 986. Plaintiffs affidavits do not set forth specific facts that would prevent the entry of summary judgment.

ning of the statute of limitations on a claim of fraud. In *Harrell v. Reynolds Metal Company*, 495 So.2d 1381 (1986), the Alabama Supreme Court stated the following:

> Facts constituting fraud are deemed discovered "when the person either actually discovered, or when the person ought to or should have discovered, facts which would provoke inquiry by a person of ordinary prudence, and, by simple investigation of the facts, the fraud would have been discovered." *Gonzales v. U–J Chevrolet Co.*, 451 So.2d 244, 247 (Ala. 1984); *Cooper Chevrolet, Inc. v. Parker*, 494 So.2d 386 (Ala.1985). If the facts regarding the discovery of the fraud are uncontroverted and they demonstrate that the discovery was more than one year prior to the commencement of the lawsuit, summary judgment is appropriate. *Gonzales, supra*, at 247; *Moulder v. Chambers*, 390 So.2d 1044, 1046 (Ala. 1980). If a person signs or receives a document that discloses facts inconsistent with the facts allegedly misrepresented to that person previously, that person is deemed to have discovered the fraud upon signing or receiving the document, even if the person did not read the document. *Cooper Chevrolet, supra; Gonzales, supra.*

In *Harrell* the Alabama court affirmed the entry of summary judgment dismissing the fraud claim of an employee who alleged that he had been promised lifetime employment. The Court held that as a matter of law the statute of limitations on the fraud claim began running at the time the employer signed an employment contract that allowed either party to terminate it.

Similarly, in *Colafranesco v. Crown Pontiac–GMC, Inc.*, 485 So.2d 1131 (Ala. 1986), the Alabama Supreme Court held that the receipt of documents contradicting oral representations as a matter of law triggered the running of the one year statute of limitations. Plaintiff contended that the defendant had misrepresented that it was selling plaintiff a 1982 Datsun when, in fact, the vehicle was a 1981 model. The court held that upon receipt of the sales contract describing the automobile as a 1981 Datsun plaintiff should have discovered the fraud. Since plaintiff waited 19 months to file suit, the court held that the suit was barred by the one year statute and affirmed the entry of summary judgment in favor of the defendant.[11]

In this case the plaintiffs have admitted executing the Regional Vice President Agreements in 1981 and 1982. Further, plaintiffs' counsel has admitted, and it is obvious that the contracts were inconsistent with the alleged misrepresentations. Therefore, according to Alabama law plaintiffs' fraud actions accrued no later than June (Kelly) and October (Carroll), 1981, and, as a matter of law, this action is barred by the one year limitations period.

In an effort to avoid summary judgment, plaintiffs filed affidavits on the day before the pre-trial conference, averring that they executed the two contracts "in an atmosphere of coercion, intimidation and fraud" which discouraged them from reading and studying the contracts.[12] Un-

---

11. The standard for summary judgment in the Alabama courts is more restrictive than the standard applied in the federal court system. *Walker v. American Motorists Ins. Co.*, 529 F.2d 1163, 1165 (5th Cir.1976). The substantial evidence rule, which governs in federal courts, requires a party opposing summary judgment to make "a far greater showing than the mere suspicion or scintilla of evidence criterion employed by the Alabama courts." *Marcus v. St. Paul and Marine Ins. Co.*, 651 F.2d 379, 382 (5th Cir.1981). Accordingly, it is significant that the Alabama Supreme Court found the Alabama law so strong and clear that summary judgment is appropriate where receipt of a document inconsistent with prior representations triggers the running of the statute of limitations. If

summary judgment is appropriate under the scintilla standard, *a fortiori*, summary judgment is proper in federal court under the substantial evidence standard.

12. Kelly's affidavit stated:

> When we executed our RVP agreement in 1981 and later in December 17, 1982, it was in an atmosphere of coercion, intimidation, and fraud. On both occasions, it occurred when they were having a large meeting of people clapping, listening to speeches and congratulating new RVP's. On both occasions, the contracts were passed around and signed and then collected before we had a chance to read and study them. As a matter of fact, I never really considered reading and studying the

der Alabama law the plaintiffs' failure to read the contracts does not preclude the running of the statute of limitations. *Harrell v. Reynolds Metal Co.*, 495 So.2d 1381 (1986); *Colafranesco v. Crown Pontiac–GMC, Inc.*, 485 So.2d 1131 (Ala.1986); *Gonzales v. U–J Chevrolet Co.*, 451 So.2d 244 (Ala.1984). The court in *Colafranesco* explained:

> The plaintiffs insist that the running of the statute was tolled by their failure to read the documents. It is undisputed however, that the documents, which showed that the automobile purchased by the plaintiffs was a demonstrator, were received by the plaintiffs in June 1982. The date that these documents were received was the date the fraud was or should have been discovered.

485 So.2d at 1134, quoting *Cooper Chevrolet, Inc. v. Parker*, 494 So.2d 386 (Ala. 1985).

Both plaintiffs have acknowledged that they received copies of the 1982 contracts in the mail after the execution of the contracts on December 17, 1982.[13] Plaintiffs have offered no suggestion of any reason that they could not have read the contracts in the privacy of their homes, away from the atmosphere of clapping, congratulation and coercion that they say impeded their review before execution.

Kelly's affidavit stated that "[a]s a matter of fact, I never really considered reading and studying the contracts because I believed everything that Art Williams told me about the contracts." Kelly's explanation is similar to that of the plaintiff in *Harrell v. Reynolds Metals Co.*, 495 So.2d 1381 (1986), who "stated that he did not read the document because he relied on the purported promises of lifetime employment made at some earlier time." The Alabama Supreme Court's response was instructive: "Under Alabama law, plaintiff is not allowed the luxury of being lackadaisical. *Retail, Wholesale & Department Store Employees Union v. McGriff*, 398 So.2d 249 (Ala.1981)."

Whether or not plaintiffs had, or took advantage of, the opportunity to read their contracts before execution, the record is clear that they received copies of the agreements shortly after December 17, 1982. Obviously, if they had chosen to do so, plaintiffs could have read them at any time thereafter. A prudent person would have read the contracts, and, under Alabama law, plaintiffs were charged with notice of the provisions of the contracts whether or not they read the contracts. Because they received the contracts more than one year before they filed suit, their fraud claims are barred by the statute of limitations.

---

RVP contracts because I believed everything that Art Williams told me about the contracts. Carroll's affidavit referred only to the 1981 contract, stating:

> I signed my first RVP contract in October 1981 under circumstances of fraud and duress. The circumstances of fraud and duress and intimidation are set forth in my deposition taken August 25, 1986 at page 25 and 26.

Plaintiffs' complaint included no allegations of fraud in the execution of their contracts. Their generalized accusations of an "atmosphere of coercion, intimidation and fraud" fail to identify a single misrepresentation concerning the contracts made at either of the 1981 or 1982 meetings. Plaintiffs both testified that Art Williams, President of A.L. Williams, indicated at the 1982 meeting that he didn't really understand the contract, and that he offered everyone the opportunity to take the contracts home to read them before signing. The peer pressure or fear of embarrassment to which plaintiffs attribute their hasty execution of the contracts does not stop the running of the statute of limitations. Indeed, a prudent person who perceives that he is being stampeded into signing a contract, should, if anything, be more attentive to the need to read his copy of the contract.

**13.** The record is less clear concerning the circumstances of the plaintiffs' execution and receipt of the 1981 contracts. Carroll testified that he did not recall whether he signed the 1981 contract (although his affidavit swears that he did) and did not recall whether he received a copy in the mail. 2d Carroll deposition at 24. Kelly testified that he signed the 1981 contract and that no one prevented him from reading it; but Kelly did not recall who was present when he signed. 1st Kelly deposition at 5–6, 12.

The plaintiffs' admitted receipt of copies of the 1982 contracts renders academic the question of whether plaintiffs received copies of their 1981 contracts at the time of execution. Plaintiffs assuredly have made no claim that the 1981 contracts were not available to them, so that they could have determined at any time whether the terms included the promises on which plaintiffs allege their relationships with A.L. Williams were based.

*Motion for Leave to Amend*

█ Plaintiffs have filed a Motion to Allow First Amendment to Complaint, which does not propose to add a new claim, but "to more specifically allege the misrepresentations." The proposed amendment would redefine the allegations of the complaint into "three basic misrepresentations," one of which appears to be entirely new.[14]

In the exercise of its discretion, the Court determines that the proposed amendment is untimely and not required by the ends of justice. See *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Freeman v. Continental Gin Co.,* 381 F.2d 459 (5th Cir.1967). This lawsuit is almost two years old, and as discussed above, the action was time-barred when filed. By direction of the Court discovery was to be completed by September 1, 1986. Plaintiffs have offered no justification for their failure to bring forward sooner all the claims of misrepresentation they cared to assert against these defendants.

Certainly, plaintiffs have not claimed and cannot claim to have "discovered" a new misrepresentation as a result of the discovery mechanisms of this lawsuit. Defendants took advantage of the provisions of Rules 30 and 33 to ask plaintiffs in interrogatories and depositions to detail all of their claims of misrepresentations. Having overlooked the newly claimed misrepresentation in providing sworn answers to defendants' questions, plaintiffs have waited too late to add it to this action, and it would be unfair to require defendants to begin discovery anew on the new accusation. Therefore, as a matter of discretion, the Court declines to allow the amendment.

Alternatively, the proposed amendment will not be allowed because it would not preclude the entry of summary judgment in favor of defendants anyway. Plaintiffs' proposed amendment fails to reveal in what respect they contend the alleged promise that they would be "independent businessmen" was false, or how they discovered that it was false.[15] Nevertheless, the vagueness of plaintiffs' allegations and their tardiness in asserting them should not be availing to them. It already has been established as a matter of law that they were on notice of their cause of action more than one year before they filed suit. The time from which the statute of limitations begins to run is not the time at which the complainant becomes aware of all of the various aspects of the alleged fraud, but rather the statute runs from the time at which the complainant should have discovered the general fraudulent scheme. *Alabama Bancorporation v. Henley,* 465 F.Supp. 648, 652 (N.D.Ala.1979); *see Berry Petroleum Co. v. Adams & Peck,* 518 F.2d 402, 410 (2d Cir.1975). Here plaintiffs should have discovered their cause of action more than three years before suit was filed. Whether plaintiffs discovered that they were or were not "independent businessmen" at that time, as a matter of law they were on notice of their claim that A.L. Williams fraudulently induced them to come to work for A.L. Williams well before December 20, 1983. Therefore, with or without the amendment, this action is barred.

### CONCLUSION

In *Celotex Corporation v. Catrett,* 477 U.S. 317, ——, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265, 276 (June 25, 1986), the Supreme Court reminded the lower courts

---

**14.** The "tripartite promises" set out in the amendment are:
 (1) that plaintiffs would become wealthy;
 (2) that they would have a vested lifetime right to overrides; and
 (3) that they would be "independent businessmen" and "have a business of their own."
Although stated differently, the first and second allegations were included in the original complaint. The third "promise" is new to the amendment.

**15.** If the plaintiffs' contention is that as "independent businessmen" they were to be free of all intervention by A.L. Williams, the company's March, 1983 refusal to allow Carroll and Kelly to transfer Carroll's hierarchy to Kelly put them on notice that A.L. Williams took a different view. If the contention is that A.L. Williams lacked the right to terminate plaintiff's contracts, the 1981 and 1982 Agreements expressly put plaintiffs on notice to the contrary.

that summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" This is a compelling case for the utilization of Rule 56.

The plaintiffs asserted a broad-based claim of fraud which they contended was so serious and egregious that the defendants should be required to pay them twenty million dollars in compensatory and punitive damages. In part the claim was vague, but in its central allegation the claim was very specific: that A.L. Williams promised plaintiffs commissions for life on each sale made by each person plaintiffs recruited. The specificity of the claimed promise afforded plaintiffs numerous opportunities to test whether A.L. Williams intended to carry it out. Indeed, since plaintiffs received payment and commission statements twice a week, they literally had a hundred opportunities a year to see whether they were receiving overrides on all their recruits' sales. According to their testimony, by no later than 1980 or 1981 plaintiffs found out a hundred times each year that A.L. Williams was *not* carrying out its promise.

The execution of written contracts between plaintiffs and A.L. Williams provided plaintiffs another tangible opportunity to determine whether they enjoyed the lifetime right to the overrides they now claim. A prudent person would have been eager to see whether the written agreements verified the alleged representations. These plaintiffs say that they never read the contracts. As a result they overlooked plain language that clearly would have alerted them that they did *not* possess the rights they claim were promised.

Because of its presumption that "claims which are valid usually are not allowed to remain neglected," Alabama law imposes a duty of diligence upon those who would sue for fraud. The record in this action conclusively demonstrates that plaintiffs cannot carry their burden of showing the lack of notice of facts that would make a reason-able person suspicious of fraud. This Court has considered all of the plaintiffs' arguments against summary judgment. In the opinion of the Court plaintiffs' contentions are without merit. No genuine issue of material fact exists, and, as a matter of law, defendants are entitled to the entry of summary judgment in their favor.